**James A. RICHARDSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 61322.**

Court of Criminal Appeals of Texas, En Banc.

May 28, 1980.

Rehearing Denied July 16, 1980.

James E. Coate, Pearland, Jim D. Wiginton, Alvin, for appellant.

Doyle W. Neighbours, Dist. Atty., A. B. Crowther, Jr., Asst. Dist. Atty., Angleton, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

Appeal is taken from a conviction for the offense of capital murder pursuant to V.T.C.A. Penal Code, § 19.03(a)(2).[1] The jury

1. Section 19.03 provides in pertinent part:
"(a) A person commits an offense if he [intentionally or knowingly causes the death of an individual] under Section 19.02(a)(1) of this Code and:

returned an affirmative finding to each of the three special issues submitted under Article 37.071(b), V.A.C.C.P., and appellant's punishment was accordingly assessed at death. Article 37.071(e), supra.

In two grounds of error, appellant complains of the trial court's failure to submit to the jury his timely requested charge regarding the law of circumstantial evidence at the guilt-innocence phase of the trial. The sufficiency of the evidence to show appellant's guilt for the murder and attempted robbery of Raymond V. Greer is not challenged; however, in light of our disposition of this appeal, a detailed statement of the evidence adduced is necessary.

Arthur Pryor, investigator and crime scene photographer for the City of Clute Police Department, testified that on October 14, 1976 he was called to the scene of an apparent murder in the City of Clute at approximately 9:00 p. m. On arrival at the scene, Pryor found present—in addition to the body of the deceased, Raymond Greer, which he described as having "a number" of bullet holes—law enforcement officers and the wife[2] of deceased. The television in the room, described as a den, was turned on. Pryor described in detail the places in which he found one .32 caliber, one .22 caliber and six .45 caliber spent shell casings in the home of deceased which he stated he identified by looking on the "end or butt" of the casing. None of the casings was introduced into evidence.[3] Pryor described a floor safe in the room which was broken and over which the floor tiles had been broken; under a medium sized dog which was wounded in the hip and lying on a rug, Pryor recovered a spent .32 caliber bullet and further noted that the .32 caliber shell casing was recovered from between a white reclining chair and a brown reclining chair which were separated by a small round coffee table. The only weapon found at the scene was a .22 caliber six shot revolver.

Investigator Pryor also described a "step-up area" in the room which he stated "just steps up into a brick type patio for the pool, for the water purposes, for drainage." The outside of the Greer residence was described by Pryor as "facing south; to the left is a junk yard that is part of Greer Automotives there. To the right is a pawn shop known as Tom's Pawn Shop. To the rear of the building is an extension of the junk yard."

Pryor testified that he received from Dr. Joseph Jachimczyk, Chief Medical Examiner of Harris County, one bullet, the caliber of which Pryor failed to identify, which was recovered from the body of the deceased during an autopsy. Dr. Jachimczyk, also called by the State, testified that the cause of the deceased's death was multiple gunshot wounds. According to Jachimczyk, there were six entry and five exit wounds in the body; one .45 caliber slug was recovered from the body and delivered to Investigator Pryor. Dr. Jachimczyk testified that the one-half inch diameter measurements of five of the wounds would be consistent with those made by a .45 caliber bullet. The other body wound measured one-quarter of an inch and according to Jachimczyk, would be consistent with having been made by a .32 caliber projectile. It was Dr. Jachim-

---

(2) the person intentionally commits the murder in the course of committing or attempting to commit . . . robbery . . . ."

Omitting the formal portions, the indictment returned against appellant alleged that he did "intentionally and knowingly cause the death of an individual, Raymond V. Greer, by shooting him with a gun; and that the said James A. Richardson did then and there intentionally cause the death of the said Raymond V. Greer in the course of committing and attempting to commit robbery, . . . ."

**2.** On questioning by the District Attorney, Investigator Pryor testified that it was his understanding that Mrs. Greer "[is now] deceased."

**3.** Though the State introduced expert ballistics testimony in the trial of appellant's co-principal, William Jack Hammett, none was adduced in the instant case. See *Hammett v. State*, 578 S.W.2d 699, 703 (Tex.Cr.App.1979) where it was stated:

C. E. Anderson, a ballistics expert with the Houston Police Department, testified that the bullet recovered from Greer's body and the bullets found in the Greer home were all fired from [a] .45 caliber automatic . . . ..

czyk's opinion that any of the six gunshots would alone have caused the death of the deceased.

The only evidence introduced which tended to link appellant with the death of Raymond Greer was appellant's written confession which had been taken while appellant was confined in the Harris County Rehabilitation Center on an unrelated charge. James Hinton, Chief of Police of the City of Clute, testified that appellant's confession was reduced to writing and signed on January 14, 1977, at approximately 3:15 a. m. in his presence, as well as the presence of six other law enforcement officers including a woman deputy sheriff who typed the statement at the Harris County Courthouse. After Hinton testified to the salient aspects of appellant's interrogation and confession,[4] the prosecutor was permitted to read the confession into the record and it was admitted into evidence. The statement signed by appellant, omitting the formal portions such as recitation of constitutional warnings, reads:

My full names[5] is James Acton Richardson and I am 18 years of age. My date of birth is 2–20–58 and I was born in Houston, Texas. My home address is 3313 Campbell Road. My home telephone number is 460–4777. I live at the above address with my mother and sister. I am not employed.

On October 14, 1976 about noon, Billy Jack, I think his last name is Hammett came over to my mothers house and picked me up and we went and ate lunch at a hanburger place in Spring Branch, I think it was Whataburger. We left the hamburger place and went over to Jeanette Sherlock's apartment I do not know her address and sat around for awhile trying to think of something to do in order to get some money. In the apartment at the time were myself, Bill Jack, Curtis McGuffie and Jeanette Sherlock. Curtis and Jeanette and Billy Jack were in the bedroom talking and I was in the

living room listening to the stereo. After a little while they came out of the bedroom and Jeanette went on doing housework or something and Billy Jack and Curtis came over to where I was and told me that they had an idea how to make some money, they thought it would be Big Money. I dont know who said what, but they told me that we were suppose to rob a guy that night who lived around Angleton, who has some big money and it would not being nothing to go down there and rob him, the idea was to go down there and walk in on him and throw down on him with guns and tie him up and take his rings and wallet and then make him tell us where the money was. We all agreed to do it that night. We stayed around the apartment for awhile and then went to some Mexican restaurnat around where Jeanette lived and ate and then went back to the apartment and sat around until it started getting dark and discussed what each one of ____ were suppose to do.

While _ were back at the apartment discussing the plans, they brought out some tape to use on him while robbing him and said that we would not have to buy any tape because we already had some. Jeanette told us what kind of car he had and told us that if the car was there, then he would be at home. We were discussing the plans and McGuffie said that he could not go in because they knew what he looked like and McGuffie was suppose to drive the car and wait outside for us. Me and Billy Jack were both suppose to go in and Billy Jack was to tie him up and after he was taped up, I was suppose to stand by the front door so that if someone came, I could let them know,, we ____ suppose to rob them, tape them on the floor and then leave. Jeanette was there when we were making the plans, but did not have too much to say about any of it.

---

4. Four grounds of error are devoted to attacking the admission of appellant's written statement; our disposition of this case obviates our address of these contentions.

5. Underlined words denote misspelling and other grammatical errors.

When it was getting dark, me, Curtis and Billy Jack all left in a yellow car, I think it was a Pontiac and it was brwn inside and was a two door, possibly a 1970 because it was not new, but not too old. I was sitting in the passenger-side bucket seat and Billy Jack was in the back seat and Curtis was driving. Billy Jack told me to get the guns out from under the seat and so I reached under the seat and pulled out two guns and one was a 45 automatic, black with brown handles and I gave it to Billy Jack, the other one was a 32 automatic and I stuck it back under the seat. We drove down to Angleton and drove up and down the street passing the house and Curtis pointed out the house and stated that was the house which had a big long fense which looked like a junk yard and back off to the side of the junk yard was the house, one story, which looked like it was attached to an auto parts store but I think it was hi office. After driving up and down the street a couple of times, we went down the street to a little restaurant place and drank a coke. We got back into the car and went back towards the house and Curtis let me and Billy Jack off about a block from the house on a road. Curtis was suppose to go to the beer joint and wait for us. We walked around the block, and came up beside a white fence and took a right and walked down and passed the house and there is a kind of alley between the fence and stopped in the alley and I waited there and there was a big trash dumpster and Billy Jack went up and looked in the window and looked in the front or side window and he jumped the big wrecking yard fence and I waited for about two or three minutes and he came back and said that they were sitting in a chair watching tv. He said there was two in there watching tv.

Me and Billy Jack then went up to the front door, I was following him and he opened the door and he went in and I was behind him and when I looked up, he was already quite a ways inside the house. I walked up behind the two people sitting in a lounger chair side by side and Billy Jack walked beside the chair and Billy Jack said "Freeze" They looked up and he said it again "Freeze" _ and Billy Jack then told them to get on the floor. He told them again to get on the floor, then the lady got up and walked up about two feet and the man got up and had a gun in his hand, I dont remember which hand and started shooting, I think he shot twice. As the man got up out of the chair before he shot, he turned towards Billy Jack, then shot twice. Billy Jack then shot at the man one or two time and then fell back onto another chair and kept on shooting at the man, I then closed my eyes and pulled the trigger on the 32 automatic which I had in my right hand. The whole time I was behind the white chair and I only shot one time. When I opened my eyes the man was lying down on the floor, I think he was on his back and Billy Jack had already gotten up off the chair and was looking down on the man. I think the woman was on the floor by the television at this time, but I really did not pay any attention to her at that time. I grabbed Billy Jack by the shoulder and told him "lets go". I dont know if Billy Jack was trying to get his wallet or not, but I grabbed him and told him lets go and we ran out the front door and ran through the front yard and down to the beer joint where Curtis was suppose to be waiting. We had stuck our guns in our pants and we got to the beer joint and Curtis was inside. The car was parked in front of the beer joint. Billy Jack got in on the drivers side and I got in the front seat on the passenger-side and Billy Jack honked the horn and Curtis came out and Bill Jack told him to hurry up and come on and Curtis came and got in the back seat and we drove off and went back to Jeanette's. While going back to Jeanette's, I put my gun back under the front seat and I think Billy Jack put his gun under the seat on his side. We got to the freeway and went down a little bit and stopped and got some gas at a think a station, I think a Texaco after getting back into Houston. I went around behind the car and threw

up and when I got back around to the car Curtis and Billy Jack were in the front seat and so I got in the back seat. I did not say anything to anyone, and Billy Jack told Curtis about what had happened.

We got back to Jeanettes house and Jeanette was in the bedroom. Billy Jack and Curtis went into the bedroom and I stayed in the living room. They then told me to come in the bedroom and I went into the bedroom and they gave me some pills, I do not know what kind, they just told me they would make me sleep. I then asked them to take me home after I took the pills. When we got back to Jeanettes house there was some more people there, some kids and two girls. I dont know who they were, and Jeanette asked them if they would take me home. The two girls took me home.

Jeanette told me not to say any thing to anybody. Curtis and Billy Jack also told me not to say anything to anybody. They then took me home. I have no knowledge of what happened to the guns after they were put under the seat on the way home.

Clute Police Chief Hinton testified that he was not aware of any homicide occurring in Brazoria County on October 14, 1976, other than that of Raymond Greer. Appellant presented no testimony at the guilt-innocence phase of trial and both sides rested.

Appellant timely objected to the trial court's failure to include a charge regarding the law of circumstantial evidence and submitted a requested charge on that aspect of law as is required by Article 36.15, V.A.C.C.P. The State argued that *Ridyolph v. State*, 545 S.W.2d 784 (Tex.Cr.App.1977) constituted authority for denial of appellant's requested charge; the trial court overruled appellant's objection and denied his requested instruction.

■ Appellant now contends that the trial court committed reversible error in failing to submit a circumstantial evidence

charge to the jury, because there was no direct evidence from any source that appellant shot and killed the victim, Raymond V. Greer, as alleged in the State's indictment. We agree.

■ The distinction between direct and circumstantial evidence is that the former directly demonstrates the ultimate fact to be proved, while the latter is direct proof of a secondary fact which, by logical inference, demonstrates the ultimate fact to be proved. *Oliver v. State*, 551 S.W.2d 346 (Tex.Cr.App.1977); *Crawford v. State*, 502 S.W.2d 768 (Tex.Cr.App.1973).

■ Generally, proof that a defendant has admitted or confessed to having killed the deceased is direct and not circumstantial evidence of the main inculpatory fact and a charge on circumstantial evidence is not required. *Ridyolph v. State*, 545 S.W.2d 784 (Tex.Cr.App.1977); *Swift v. State*, 509 S.W.2d 586 (Tex.Cr.App.1974); *Corbett v. State*, 493 S.W.2d 940 (Tex.Cr.App.1973); *Steel v. State*, 459 S.W.2d 649 (Tex.Cr.App. 1970). To constitute direct evidence, however, the admission or confession must *unequivocally* admit the commission of the very same act charged; only in this instance is the trial court relieved of the necessity of instructing the jury on the law of circumstantial evidence where the State is relying on the confession *alone* to supply proof of the main inculpatory fact. *Ridyolph*, supra; *Hielscher v. State*, 511 S.W.2d 305 (Tex.Cr.App.1973); *Martinez v. State*, 151 Tex.Cr.R. 316, 207 S.W.2d 387 (1948).

■ Even if an accused admits to the commission of a crime "it must be shown by the evidence and the confession of the accused that the crime admitted is the *same*[6] crime for which the defendant is being tried if the circumstantial evidence charge is not given. If it is only by a process of inference from the confession . . . that it can be determined that the accused did the killing or was a guilty participant therein,

---

**6.** All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

the court should give the circumstantial evidence charge." *Ridyolph* at 789; see also *Casey v. State*, 523 S.W.2d 658 (Tex.Cr.App. 1975); *Hielscher*, supra; and *Martinez*, supra.

While it is clear in the instant case that appellant's confession is direct evidence that he participated in the commission of an offense, it is equally clear that it does not constitute an unequivocal admission—and therefore direct evidence—that he was guilty of the murder of Raymond V. Greer, the deceased herein. See *Casey*, supra.

Our next inquiry, then, is to consider whether the evidence in this case falls within a narrow exception to the requirement that a circumstantial evidence charge is mandatory if the main fact to be proved is established only by inferences from other facts, as announced in *Chapin v. State*, 167 Tex.Cr.R. 390, 320 S.W.2d 341 (1959). In *Chapin*, supra, the evidence illustrated a long standing enmity between the accused and the deceased which ended one late night when the ill feeling was reactivated by the deceased. The accused was heard to say he "ought to kill" the deceased "or cut his throat." Thereafter, two witnesses observed the accused enter the deceased's vehicle where a fist fight ensued; however, no witness saw the accused stab the deceased. After the fight, the accused exited the vehicle and the two witnesses spoke with the deceased who responded in "a low mumbling voice similar to his usual voice when intoxicated and said that it was all right for them to go home." The deceased's body was found five hours later in his car and an autopsy established that the cause of death was two stab wounds to the chest. The accused admitted that he was angered

by the deceased's calling him names, and after deceased hit him, he opened his knife and the two fell into the automobile fighting. However, the defendant denied stabbing deceased in the chest, admitting only that he "might have cut the deceased on the wrist."

This Court held in *Chapin* that when the facts established, though they be circumstances, stand in such relationship one to another that the *only* logical conclusion to be drawn therefrom is that the accused inflicted the fatal injury, then failure to charge on the law of circumstantial evidence does not constitute error.[7] The rationale of such a rule is obvious; what is less apparent is determining the appropriate application thereof, for circumstances though sufficient to support an inferred jury finding of guilt may nevertheless fall short of excluding *every other* reasonable hypothesis.[8] Indeed, it is in such a case that the accused's right to the submission of a circumstantial evidence instruction is crucial. See *Frazier v. State*, 576 S.W.2d 617 (Tex.Cr.App.1978); *Hielscher*, supra.

In perpetuating the correct application of these principles of law, "each case must in a measure be tested by its own facts," *Patterson v. State*, 416 S.W.2d 816, 819 (Tex.Cr. App.1967), considering the confession in light of all the other evidence. *Ales v. State*, 587 S.W.2d 686 (Tex.Cr.App.1979); *Campbell v. State*, 545 S.W.2d 791 (Tex.Cr. App.1977); *Ridyolph*, supra; *Hogan v. State*, 496 S.W.2d 594 (Tex.Cr.App.1973).

In the instant case, appellant's confession admits an attempted robbery and ultimate murder of an unnamed male in Angleton in a house which was divided by "a kind of alley" where there was "a big trash dump-

---

7. This rule has been restated many different ways, but ultimately, it has come to be known as "the close juxtaposition rule," a rule "which basically dispenses with the necessity for a circumstantial evidence instruction where facts proven are so closely related to the main fact essential to guilt so as to be the equivalent of direct testimony." *Frazier v. State*, 576 S.W.2d 617, 619 (Tex.Cr.App.1978).

8. "There is a difference between the facts being in such a juxtaposition to warrant an inference

of guilt and facts being in such a juxtaposition as to be equivalent to direct testimony. The former, no matter how strong they are or how certain is the guilt of the accused, cannot justify a failure to charge on circumstantial evidence. The latter set of facts will occur only where the evidence is such that it is logically and practically the virtual same thing as direct evidence of the *factum probandum*." *Riggins v. State*, 468 S.W.2d 841, 846 (Tex.Cr.App. 1971).

ster," from a big long white fence "which looked like a junk yard." Appellant admits to having fired a .32 caliber pistol once from behind a white chair while his confederate fired an undetermined number of shots from a .45 caliber pistol. The evidence disclosed that the deceased, Raymond Greer, was shot at his home in Clute [9] which was adjacent to both Greer Automotives junk yard and Tom's Pawn Shop. There was no testimony that the Greer residence was divided by an alley with a big trash dumpster, from a long white fence. See *Martinez*, supra. Though the date fixed by the confession and that shown by other evidence coincide, no specific time was mentioned. There was no mention in appellant's confession of the presence and injury of a dog or the attempted entry of a floor safe. The only weapon found at the scene was a .22 caliber pistol. No fingerprint evidence linked appellant to the scene of the murder of Raymond Greer. Compare *Swift v. State*, 509 S.W.2d 586 (Tex.Cr.App.1974). Appellant was neither connected by any witness to the scene of the homicide,[10] nor to flight therefrom or any other attempt to cover his participation in the offense.[11] The State failed to establish any direct link between appellant and any fruit of the crime[12] or that any instrumentality of the crime was ultimately traced to appellant.[13]

On appeal the State, citing neither the record nor authority under these grounds of error, argues "the jury could certainly infer from the evidence beyond a reasonable doubt that the appellant directly participated in the killing of Raymond Greer." While apparently not intended as a confession of error, we are constrained to agree with this statement. See *Hielscher*, supra.

The jury was indeed relegated in resolving the issue of appellant's guilt—that the murder in which he admitted his participation was in fact the murder of Raymond Greer—to a process of inference. We are, therefore, unable to reach the conclusion that the State's case was not one of circumstantial evidence, *Martinez*, supra, and such degree of doubt clearly dictated the submission of appellant's requested charge. *Frazier*, supra.

■ We hold that "where guilt must be inferred from circumstances in evidence, the trial court has the duty to give a charge regarding the law of circumstantial evidence, and it is not relieved of such duty by virtue of the fact that circumstances may strongly point to the accused." *Hielscher*, supra at 308. In refusing to submit appellant's requested charge herein, the trial court committed reversible error.

For the error in this regard, the judgment of conviction is reversed and this cause is remanded.

ODOM, Judge, concurring in part and dissenting in part.

I concur in the reversal of this conviction, but not on the ground relied on by the majority.

I decline to join the holding that a circumstantial evidence charge was called for under the facts of this case. The confession and other evidence set forth in the majority opinion clearly demonstrate that the State's case did not establish that the offense to which appellant confessed is the same offense as that for which he was tried and convicted.

**9.** The trial court refused the State's request that judicial notice be taken that Angleton, like Clute, is situated in Brazoria County.

**10.** Compare *Ales*, supra; *Ridyolph*, supra, *Hogan*, supra; *Steel*, supra; *Patterson*, supra; *Chapin*, supra. Compare also *King v. State*, 585 S.W.2d 720 (Tex.Cr.App.1979) in which the testimony of two witnesses connecting appellant to the scene a few minutes prior to the discovery of the theft, constituted the precise distinction in this regard between that case and the one before us.

**11.** Compare *Campbell*, supra; *Ridyolph*, supra; *Knight v. State*, 538 S.W.2d 101 (Tex.Cr.App. 1975); *Corbett*, supra.

**12.** Compare *Swift*, supra; *Corbett*, supra; *Patterson*, supra.

**13.** Compare *Ales*, supra; *Ridyolph*, supra; *Sloan v. State*, 515 S.W.2d 913 (Tex.Cr.App. 1974); *Swift*, supra; *Hogan*, supra; *Chapin*, supra.

The majority hold the connection between the confession and the evidence of the corpus delicti is made by so tenuous a set of inferences as to require a circumstantial evidence charge. I would hold the inferences too tenuous to support the connection at all, and hold the evidence insufficient. For this reason I dissent to the remand of this case for a retrial.

DALLY, Judge, dissenting.

I am astonished that the reading of this record could lead one to the conclusion that the evidence connecting the appellant with the corpus delicti is too tenuous to support appellant's conviction, and I am only a little less astonished that others would find that the trial court erred in failing to submit to the jury a charge on circumstantial evidence. However, a plurality of the court for these reasons have reversed the judgment. There can be no doubt that Greer, the alleged victim, met his death by criminal means. I believe the appellant's confession, aided by other direct evidence, is sufficient to establish the appellant's guilt for the death of the named victim either by his own act or the acts of those for whom he is criminally responsible. If in the appellant's confession he had said that the killing was in Clute rather than in Angleton the majority and concurring opinions would be shorn of any vitality.

If a defendant unequivocally admits or confesses that he killed the deceased, proof of the admission or confession is direct evidence of the main inculpatory fact and a charge on circumstantial evidence is not required. *Sloan v. State*, 515 S.W.2d 913 (Tex.Cr.App.1974); *Hurd v. State*, 513 S.W. 936 (Tex.Cr.App.1974); *Swift v. State*, 509 S.W.2d 586 (Tex.Cr.App.1974); *Corbett v. State*, 493 S.W.2d 940 (Tex.Cr.App.1973). On the other hand, if the admission or confession is equivocal as to the killing of the deceased, or if it is not clear that the killing admitted or confessed is the killing with which a defendant is accused, proof by the admission or confession alone will not relieve the trial court of the necessity of giving a circumstantial evidence charge.

*Ridyolph v. State*, 545 S.W.2d 784 (Tex.Cr. App.1977); and see *Hielscher v. State*, 511 S.W.2d 305 (Tex.Cr.App.1974); *Martinez v. State*, 151 Tex.Cr.R. 316, 207 S.W.2d 387 (1948). However, even if the confession is equivocal, a circumstantial evidence charge is not necessary if other direct evidence, together with the confession conclusively establishes that the killing confessed is the killing for which the defendant is on trial. *Barefoot v. State*, 596 S.W.2d 875 (Tex.Cr. App.1980); *Ridyolph v. State* supra; *Hogan v. State*, 496 S.W.2d 594 (Tex.Cr.App.1973); *Steel v. State*, 459 S.W.2d 649 (Tex.Cr.App. 1970); *Patterson v. State*, 416 S.W.2d 816 (Tex.Cr.App.1967).

Many of the details contained in appellant's confession coincide with the details of the Greer murder as established by other direct evidence. The confession states that the shooting took place October 14, 1976. The evidence establishes that Greer was shot that day. The confession states that appellant fired a .32 caliber pistol and his companion fired a .45 caliber pistol. Pryor testified that he found spent bullets and empty casings of both .32 and .45 caliber, and Dr. Jachimczyk testified that the wounds to Greer's body were made by .32 and .45 caliber bullets. The confession states that the house in which the shooting took place was next to a junk yard. Pryor testified that the Greer house was next door to a junk yard. The confession states that "the man" and "the woman" were sitting in "lounger" chairs watching television, and that one of the chairs was white. Pryor testified that Mrs. Greer was present when he arrived at the scene soon after the shooting and the television set was on. Pryor also testified that two reclining chairs, one white and one brown, were in the room where the shooting took place. The confession states that the man who was shot had a handgun and shot at appellant's companion. Pryor testified that he found a .22 caliber pistol belonging to Greer in one of the chairs and that it had been fired. The confession states that the victim was lying on his back when appellant and his companion fled. Pryor testified that Greer was found lying on his back. Hinton testi-

fied that the description of the house found in the fourth sentence of the fourth quoted paragraph, of appellant's confession was a reasonably accurate description of the Greer house and the surrounding area.

Other important testimony links the confession to the Greer murder. Hinton testified that he normally learns about every homicide in the county and that he was not aware of any other homicide in the county on October 14, 1976.

The only major discrepancy between the confession and the facts of the Greer murder as shown by other direct evidence is that the confession states that the killing took place in Angleton while the evidence shows that the Greer house was in Clute. The effect of this discrepancy is significantly diminished by evidence elicited during cross-examination of Pryor showing that both cities are located in a heavily populated part of Brazoria County and that a person driving from Houston would pass through Angleton on the way to Clute.

The testimony of the police and the medical examiner, together with appellant's confession, conclusively establishes that the murder described in the confession is the murder of Raymond Greer. Therefore, the confession, coupled with the other evidence, is direct evidence of the main inculpatory fact and the trial court did not err in refusing to charge on the law of circumstantial evidence. See *Barefoot v. State,* supra; *Ridyolph v. State,* supra; *Hogan v. State,* supra; *Steel v. State,* supra; *Patterson v. State,* supra; *Chapin v. State,* 167 Tex.Cr.R. 390, 320 S.W.2d 341 (1959).

I am content to rest my dissent on the well established principles of law already discussed as applied to the facts of this case, and I do not necessarily advocate a change, but perhaps we should remember that in most jurisdictions a charge on circumstantial evidence is not required. The Supreme Court of the United States has held that a charge on circumstantial evidence was unnecessary and that a charge such as is given in this State is confusing and incorrect.

"The petitioners assail the refusal of the trial judge to instruct that where the Government's evidence is circumstantial it must be such as to exclude every reasonable hypothesis other than that of guilt. There is some support for this type of instruction in the lower court decisions, but the better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect.

"Circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more." (citations omitted.)

*Holland v. United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed.2d 150 (1954).

The argument against giving a special charge on circumstantial evidence was well stated by Judge Learned Hand in *United States v. Becker,* 62 F.2d 1007 (2d Cir. 1933).

"The requirement seems to us a refinement which only serves to confuse laymen into supposing that they should use circumstantial evidence otherwise than testimonial. All conclusions have implicit major premises drawn from common knowledge; the truth of testimony depends as much upon these, as do inferences from events. A jury tests a witness's credibility by using their experience in the past as to similar utterances of persons in a like position. That is precisely the same mental process as when they infer from an object what has been its past history, or from an event what must have preceded it. All that can be asked is that the importance of the result to the accused shall demand a corresponding certainty of his guilt; and this is commonly and adequately covered by telling

them that the conclusion shall be free from fair doubt. To elaborate this into an inexorable ritual, or to articulate it for different situations, is more likely to impede, than to promote, their inquiry." 62 F.2d at 1010.

A charge on circumstantial evidence is now refused in most federal courts. E. g. *United States v. Clements*, 588 F.2d 1030 (5th Cir. 1979); *United States v. Stokes*, 471 F.2d 1318 (5th Cir. 1973).

"At one time it was fashionable to instruct a jury that if the government's evidence was circumstantial, it must be such as to exclude every reasonable hypothesis other than that of guilt. The Supreme Court has criticized instructions of this kind, saying that 'the better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and·incorrect.' Most courts now refuse to give this kind of instruction."

2 C. Wright, Federal Practice and Procedure, Sec. 493, p. 319.

The modern trend in state courts is also away from requiring a charge on circumstantial evidence. Note, the Circumstantial Evidence Charge in Texas: A Retrograde Doctrine, 55 Texas L.Rev. 1255, n. 45 at 1260 (1977).

I dissent to the reversal of this judgment. The conviction should be affirmed under the well established law of this State.

DOUGLAS, TOM G. DAVIS and W. C. DAVIS, JJ., join in this dissent.